# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43015

JAIMI DEAN CHARBONEAU,       )
                                         )      **Boise, April 2017 Term**
        Petitioner-Respondent,     )
                                         )      **2017 Opinion No. 49**
v.                                       )
                                         )      **Filed: May 26, 2017**
STATE OF IDAHO,            )
                                         )      **Stephen W. Kenyon, Clerk**
        Defendant-Appellant.      )
                                         )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, in and for Jerome County.  Hon. Robert J. Elgee, District Judge.

The judgment of the district court is <u>reversed</u>.

Kenneth K. Jorgensen, Deputy Attorney General, Boise, argued for appellant.

Erik R. Lehtinen, Deputy State Appellate Public Defender, Boise, argued for respondent.

_____

EISMANN, Justice.

This is an appeal out of Jerome County from a judgment in a post-conviction proceeding granting the petitioner a new trial in his criminal case.  We reverse the judgment of the district court.

## I.
## Factual Background.

Jaimi Dean Charboneau murdered his ex-wife, Marilyn Arbaugh, on July 1, 1984.  Her two daughters, Tiffnie and Tira, were present when he murdered their mother, and they both testified during his trial.  The facts surrounding the murder were as follows:

> On June 21, 1984, Jaimi went to the cafe where Marilyn worked.  They left in Marilyn's car.  There is some dispute whether Marilyn went with Jaimi voluntarily.  The next day Marilyn reported to the police that Jaimi had kidnapped and raped her and had stolen her car.  There is evidence that Jaimi travelled to

Nevada after June 21. The burned remains of Marilyn's car were found in southern Idaho in late June 1984. On June 25, 1984, Jaimi was charged in Jerome County, Idaho with first degree kidnapping of Marilyn and grand theft of her car.

On June 28, 1984, Jaimi purchased a .22 caliber rifle from a hardware store in Gooding, Idaho. About mid-morning on Sunday, July 1, 1984, Marilyn returned to her residence on a ranch near Jerome, after being gone since the evening before. Some time after 11:00 o'clock that morning Marilyn went out to check some horses in a corral near her home. Shortly after that Marilyn's daughter Tiffnie heard shots outside, grabbed Marilyn's .22 pistol, and went to see what had happened. She found her mother sitting on the ground in the barn with blood on her. Jaimi was standing close to Marilyn with a .22 caliber rifle pointed at Marilyn. Tiffnie asked Jaimi to leave and told him she was going to call the police. Jaimi told Tiffnie that he would take Marilyn to the doctor. Both Marilyn and Jaimi told Tiffnie to leave.

At 11:38 that morning Tiffnie called the Jerome County Sheriff's office and said that Jaimi had shot her mother. Tiffnie then told her sister Tira about the shooting, and they both got dressed. They heard more shots and ran outside where they hid behind a sheep wagon and called to their mother. Tiffnie had her mother's .22 caliber pistol with her, and it accidentally discharged behind her. She ran into the house, hid the gun, returned to the sheep wagon, and then ran to the barn. Tira followed close behind. Marilyn was lying on her back with her arms over her head. The girls ran back to call for an ambulance. At 11:42 a.m. Tira telephoned for assistance and reached the Jerome County Sheriff's office. She told them to get an ambulance and that her mother was dying. When the sheriff's deputies arrived at the scene, they found Marilyn's body in the barn and located Jaimi in a field near the barn with a .22 caliber rifle lying nearby. Jaimi was arrested and charged with first degree murder. At the time of his arrest, Jaimi acknowledged that he had shot Marilyn, although he stated that he did so because she was going to shoot him.

*State v. Charboneau*, 116 Idaho 129, 133, 774 P.2d 299, 303 (1989).

On June 15, 2011, Charboneau filed his fifth petition for post-conviction relief, contending that on March 18, 2011, he learned of evidence of a *Brady* violation and an ineffective assistance of counsel claim. In his supporting affidavit, he contended that on March 18, 2011, a correctional officer where Charboneau was incarcerated brought him a large envelope containing various documents upon which this post-conviction petition is based. The significant documents are described below.

**Tira letter and envelope.** The large envelope contained a photocopy of a letter written by Tira to Judge Becker ("Tira Letter"), who presided over Charboneau's criminal trial, and a photocopy of the envelope in which it was allegedly mailed to Judge Becker. In the letter, she claimed that she had been pressured by the prosecutor and a detective to testify falsely at

2

Charboneau's trial and that it was Tiffnie, not Charboneau, who fired the fatal shot killing their mother. Tiffnie apparently could not be located with respect to these proceedings. The envelope bore a postmark from Bruneau, Idaho, dated September 7, 1989, and a return address of 622 Highland Rd., Jerome, Idaho.

However, the letter and envelope were photocopies, not the originals. Who made the photocopies is unknown, and is it not known when those photocopies were made or who provided them. Charboneau's expert testified that "all photocopies can be manipulated in some fashion." The expert was not asked whether the letter and envelope were the first-generation photocopies of the originals, but she testified that the forged Orville Balzer statement discussed below was about a tenth-generation photocopy.

Tira had married Charboneau's half-brother on October 13, 1988, when she was eighteen years of age, and she had passed away on September 24, 1998. The letter stated, "I am in Bruneau Idaho for a cowboy benefit + street dance where the Pinto Bennetts band is providing the music" and "I will be back in Jerome early next week." The street dance did not occur until ten days after the date of the letter. Tira's husband testified that in September of 1989 he and Tira were living on a ranch in Wells, Nevada; that he was working on the ranch and she usually worked with him; that they did not have a car; that he had never been to a street dance in Bruneau; that during their marriage he and Tira had never spent the night apart except for one week during Christmas of 1989; that she signed the letter with her maiden name, which she had not used as long as he had known her; and that by September 1989 they had a child. The district court wrote, "For a variety of reasons, the Court does not accept (and in fact rejects) his testimony," but the court did not state what those reasons were.

The statements in the Tira Letter contradict Charboneau's testimony in key respects, and the forensic evidence contradicts both of their versions.

Tira was fourteen years of age when her mother was killed, and her sister Tiffnie was sixteen years of age. At Charboneau's criminal trial, Tira testified that on the day of her murder, Marilyn had taken a bath and gone out to make a telephone call to her mother and father. They did not have a telephone in their house. The telephone was in the nearby shop that was used by the man who farmed the land. Tiffnie was on her bed reading, and Tira was going to bathe after her mother. As Tira was running the bath water, her mother came back into the house and asked Tira if she had put the horses in a different corral. Tira stated that she had not, and her mother

3

went back outside. The water was still running, Tira heard a yell, and then heard Tiffnie jump off her bed onto the floor. Tira continued bathing, and a short while later Tiffnie came into the bathroom and said really fast in a scared, shaky tone of voice: "Tira, Jaimi's outside and he shot Mom. Get out of the bathtub and hurry up."

Tira ran into her room and hurriedly put a pair of pants and a shirt, which were too big for her because they belonged to Tiffnie's boyfriend, Bart, who lived with them. She then put on his boots that were also too big. She testified that Tiffnie grabbed their mother's .22 caliber pistol while Tira was dressing, although she did not actually see Tiffnie grab the pistol. Tira stated that the pistol was kept behind the radio on their mother's bedstead and that she had seen it there the night before.

Tira then testified:

> A. Well, we ran out behind the sheep wagon. Tiffy told me not to go past it, and we were yelling but—
> Q. What were you yelling?
> A. We were just—well, I just—we couldn't really hear anything or nothing. And Tiffy was kind of in front of me, and I was off to the side. My dog was sitting right next to me, and Tiffy was shaking really bad and she fired a shot, scared me, and it just went, almost hit my dog. And I heard the gravel hit the side of the barn and everything and Tiffy was really nervous, so we went back into the house. We went back into the house.
> Q. Let me interrupt you. Before you went back into the house, what were you yelling as you were standing out by the sheep wagon?
> A. We were just yelling to Mom. We were kind of being quiet, but we was yelling to mom. We was, you know, but we wasn't getting any reply, you know. We wasn't getting nothing.
> Q. No reply?
> A. Yeah.

On cross-examination, Tira gave more information regarding the shot fired by Tiffnie:

> Q. And did Tiffy have the pistol in her possession at that time [when they went outside the first time]?
> A. Yes.
> Q. What did she do with it?
> A. She just carried it out there.
> Q. And is that when the shot went off the first time you when [sic] [went] to the sheep wagon?
> A. Yes. We was behind the sheep wagon. Her hands were behind her back and she shot once.
> Q. They you went back into the house?
> A. Yes. We was scared. So we went back into the house.

4

When they went back into the house, Tira changed into her own clothing. She testified that while doing so, she heard more shots.

> Q. Okay. Did anything else happen while you were in the house changing clothes?
> A. Well, yes. Right when I was putting my leg in my pants we heard several more shots, about five or so, five.
> Q. You would say it's about five shots?
> A. Yes.
> Q. It would have been more or less?
> A. Yes.
> Q. Are you certain, you're not certain of the number?
> A. No. I was too scared to be counting them.

Tira testified that she and Tiffnie ran back out of the house to the alleyway in the horse barn, where they found their mother lying on the ground. Tira was behind Tiffnie, so Tiffnie was the first one into the barn. Tira testified what she saw as follows:

> Q. Where was Tiffy?
> A. Tiffy had my mom in her arms, and Tiffy pulled up her shirt or something, and we could see a lot of blood and stuff on her chest. And I just brushed my hand across her cheek because I didn't know what to do.
> Q. Across your mom's cheek?
> A. Yes. And right when I did that blood started running from her mouth and her nose, and Tiffy told me to go get an ambulance and I stood there for a second and then she said go, so I just got up and I ran out. And I called the ambulance . . . .

On cross-examination, Tira was asked twice whether her testimony was true, and both times she answered that it was. Defense counsel also asked her what she thought of Charboneau. The questions and her answers were as follows:

> Q. What do you think about Jaimi'?
> A. What am I supposed to think?
> Q. Do you dislike him?
> A. He—I—I don't know. He—he killed mom. What am I supposed to think?

In the Tira Letter, she stated that she was told by an officer to write some things in her written witness statement that were not true. She asserted that the officer told her to write a specific time for when she woke up on the morning her mother was killed, and she did not know what time it really was. She then wrote that that "after mom woke up that morning I remember her asking Jamie [Charboneau] to go out + check on our horse that had been to the vet a few days

5

earlier." According to the letter, before Charboneau went outside, her mother gave her a .22 caliber rifle that was a graduation gift from her and Charboneau.

> Before Jamie [sic] went outside to check on the horses mom came back to my bedroom + gave me a big box wrapped in decorative paper. When I opened the box it had a new .22 rifle in it that was my graduation gift from mom + Jamie [sic]. After I told them thank you Jamie [sic] went outside + mom went into the bathroom to take a bath. After mom got dressed she told Tif + me that she was going outside to help Jamie with the horses.

The rifle that Charboneau purchased for Tira was a Remington, and it was the murder weapon.

Tira then wrote that she told the officer when she first heard her mother screaming, she was screaming for Tiffnie. Tira was still in the bathtub, and Tiffnie came running into the bathroom and screamed at Tira to get dressed. Tiffnie grabbed the Remington rifle and gave Tira their mother's .22 caliber pistol. Tira described what occurred then as follows:

> I followed Tif over behind the sheep wagon which was right across the driveway from the barn. We could see mom in the alleyway by the feed corrals but I did not see Jaimi. I could only hear his voice. I remember I heard Tif shoot the rifle while we were behind the sheep wagon. I remember this because it startled me so much that I accidently fired mom's pistol which also scared me.

Tira wrote that she then asked Tiffnie what was going on, and she answered that their mother had taken her own .22 caliber rifle with her when she went outside to help Charboneau. She asserted that she told the officer that, and he said he would make a note of it, but it was not necessary for Tira to write down every little thing in her statement.

At trial, Tira testified that the only .22 rifle in the house was the Remington. She was asked about other .22 firearms where they lived, and she made no mention of the Remington rifle that Charboneau claimed to have given her, nor did she state that her mother owned a .22 rifle. Her testimony was as follows:

> Q. Were there other .22 pistols or rifles out at El Rancho other than the Ruger [pistol]?
> A. Donna's boys had a .22 rifle. No, I think—well, they had a .22 gun, too. I don't know exactly what it was.
> Q. Did you—did you or your sister or your mother have any other .22s?
> A. Well, Bart had one.
> Q. What kind of rifle was it? I know it was a rifle. What kind of a gun was that?
> A. It was just a little, short one, silver, had a little short, about—it was just little.
> Q. Do you know what brand that was?

6

A. No.

Donna and her boys lived at a second house on the property. Tiffnie's boyfriend, Bart, lived in Marilyn's house. The defense called Tiffnie as a witness, and she testified that her mother did not have a .22 rifle.

In her letter, Tira wrote that a few days later, another officer came to her and stated that she had forgotten to write about hearing more shots after she and Tiffnie had gone back into the house. She wrote that she had to sign another statement to that effect even though it was not true. She also claimed that a prosecutor told her to get rid of her mother's .22 rifle and that she, her grandfather, and her uncle buried the rifle on the property, right behind a potato cellar where her uncle had thrown some of her mom's things into the crawl space a few weeks after she was killed.

Tira's account in the Tira Letter differs from Charboneau's. He testified that he purchased the Remington rifle for Tira as a graduation present; that he arrived at Marilyn's house on Thursday evening, but nobody was home; and that when he later saw Marilyn walk to the shop to make a telephone call, he called to her and they talked. According to him, "[S]he didn't want the girls to know I was there for a few days, and I said, 'Fine.'" He testified that he then showed her the rifle he had purchased for Tira, and Marilyn said they would give it to her in a couple of days. His testimony was as follows:

> Q. Did you show her the gun?
> A. Yeah, I showed her. I said, "I got that .22 for Tira." And she said, "Fine."
> She said she didn't like a—it had a small scope on it, too; it came with it. And she said, "I don't think Tira needs a scope, especially on a .22," that she didn't need that. Fine. Said we'd give it to her in a couple of days.
> Q. Did she take the gun with her at that time?
> A. No, she didn't.

According to Charboneau, he stayed in the tack room until Sunday morning. He testified that on Friday morning, Marilyn came to the tack room and told him she was going to work; that he next saw her on Friday evening, when she brought him a snowmobile jacket; that on Saturday morning she came to the tack room and said she was going to work; and that on Saturday evening she brought him some food, which was the first time he had eaten since he arrived on Thursday.

7

Charboneau testified that Marilyn woke him up on Sunday morning at about 9:30 or 10:00 a.m. According to him, she said that she would tell her daughters that he was there and they could give Tira the rifle. His testimony was as follows:

> Q. Did you talk about where she was last night?
> A. Yes, but I talked about that a little later.
> Q. Okay. Talk about right then is what I am concerned about. Was there any argument right there?
> A. No, there was not. She said that she was going to tell the girls that I was there that day. And she said we could give the rifle to Tira, and we could take her down to the gun range and let her sight it in.
> Q. Did she do anything with that gun and box?
> A. Yes, she got up then; and she picked up the gun, and it was still where I put it the first day and she picked it up, and she said that she was going to take the scope off because she didn't want Tira to have it. And I said, "Fine."

Charboneau testified that he noticed that the horses were out, and she asked him if he had let them out; that he answered that he had not; and that she responded that maybe the girls had done so. He then testified that she took the rifle to the house and returned with it five to fifteen minutes later. His testimony was as follows:

> A. . . . She went in and she was gone five, ten, maybe fifteen minutes; and she came back, and she had the gun. The scope was off of it. She didn't have the box or anything or nothing. She had a handful of shells, though, and she sat down. And I was pulling my boots on then. And she put shells in the gun. I don't know how many. But she put shells in the gun, and then she leaned it against the feed bunk on the inside of the tack room.

Charboneau testified that he asked her where she had been the night before, and she stood up and stated that she loved him. He then described what happened as follows:

> And she picked up the gun, and she pointed it at me. She said, "You're dead. No other woman is going to have you." And she said, "You're dead." And I stood looking at her down the barrel of that gun and scared. And anyway, I heard a click. I don't know what it was. I heard a click.
> And right there I grabbed the barrel of the gun, and I pointed it up towards the roof of the barn, and I wrestled it from her, took a while; and she was screaming all that time. She was screaming to Tiffy to bring Rufus or something. She had pet names for all her guns. . . . .
> And, anyway, she was screaming for Tiffy while we was wrestling for the gun and she said, "Bring Rufus," or something, and I got the gun from her and she turned around and ran down the alleyway. I was in right by the door, and she ran that way; and I heard the door slam, and I seen Tiffy coming. She was in her nightgown, and she had the pistol in her hand. And a few seconds later, when she was about halfway between me and the house, and I had at my hip, and I didn't

8

know if Marilyn was going to run around and get another gun or what; and I closed my eyes, and the gun went off. It went off—I don't know four or five times, I—I guess.

I opened my eyes, and Marilyn was on her knees and she was bleeding from one leg and she was holding her hand on this shoulder near to her arm. And I ran down to her and stood right beside her and I said, "Gees, Marilyn, what are you wanting to shoot me for?" And just then she looked down the alleyway of the barn, and she said, "Tiffy, get out of here." And I looked down here and seen Tiffy. I said, "Tiffy, go call an ambulance for your mother."

Charboneau testified that he knelt down next to Marilyn and leaned the rifle against a feed bunk. He then heard something and saw Tiffnie running toward them with the pistol in her hand. She said she hated them both and fired the pistol two or three times. He took off running, thinking that Tiffnie was shooting at him, and he then heard some talking. He eased back by the door of the barn and heard Tiffnie yelling at her mother. He then testified:

And that's when I peeked around the corner, and I seen Tiffy standing up above her mother, and her mother on her knees, and Marilyn was looking up at Tiffany, and she said, "Tiffy, I'm your mother."

And that's when I heard the gun go off, and I seen Marilyn's hair fly up close to the top of her head. I seen some hair fly up.

Charboneau testified that he then picked up the Remington rifle and ran 200 yards into a wheat field, where he threw the rifle. That is where it was discovered by the police.

Q. Right after that shot was fired what happened? What did Tiffy do?

A. . . . . I just looked around to the edge of the barn, and I heard Tiffy scream. And I heard her run out of the way; she was screaming, her hands over her ears and—

Q. Was the gun [pistol] still in her hand?

A. Yes, it was still in her hand, yes; and then as soon as she was gone, I ran back in there, and I picked up the gun, the rifle.

Q. Why did you go back to pick up the gun?

A. Because I knew that Tiffy had probably, if she didn't call an ambulance, she called Jim Arbaugh; and I have never liked him anyway, and we have never gotten along, and I knew that he was possible of things way before this ever happened. So I grabbed that gun. I didn't want to have anybody give me— shooting at me, and I didn't want to shoot at anybody. I grabbed that gun. And I ran back out of the barn, and I got the gun, and this time I put my hand on the top barb and over the fence. And I ran about 200 yards to a wheat field where I waited for the police to arrive.

In this wheat field I figured I could, if Jim Arbaugh showed up, I could hide from him.

Q. What did you do with the gun before he got there?

9

A. I threw it to where nobody else could find it and I could still tell the police where it was at or approximately.

Thus, the account in the Tira Letter contradicted Charboneau's version of what happened. Tira wrote that Charboneau was in the house on the morning that Marilyn was killed. Charboneau's version was that he was not in the house, but had been staying in the tack room. Tira wrote that Marilyn and Charboneau gave her the Remington rifle that morning. Charboneau's version was that Tira was never given the rifle; he had it in the tack room until Marilyn took it for five to fifteen minutes to remove the scope and then returned to the tack room with the rifle. Tira wrote that Tiffnie took Tira's .22 rifle, gave her their mother's .22 pistol, and they both went outside and hid behind the sheep wagon. Charboneau's version was that only Tiffnie came out of the house; she had a .22 pistol, not the rifle; and she did not hide behind the sheep wagon. Tira wrote that while she and Tiffnie were behind the sheep wagon, she heard Tiffnie shoot the rifle. Charboneau's version was that Tiffnie shot her mother with a .22 pistol while standing over her. Tira wrote that Tiffnie had Tira's .22 rifle. Charboneau's version was that he had the rifle and took it with him when he ran into the wheat field, where he threw it into the field.

The forensic evidence was inconsistent with Charboneau's account. As District Judge John Butler found with respect to Charboneau's third petition for post-conviction relief:

> A review of the testimony concerning physical evidence from the trial indicates that the victim died from gunshot wounds to the chest. The recovered bullets came from a Remington .22 Rifle, and all but one of the bullets analyzed was determined to have been fired from the specific rifle retrieved at the crime scene and which the petitioner has admitted to using. The remaining bullet, identified as "C" was determined to have probably been fired from the Remington Rifle, however, the ballistics expert could not state absolutely that it was fired from the Remington in custody. The ballistics expert could definitely determine that "C" was not fired from the Ruger .22 pistol that had also been recovered from the scene.

The pathologist who performed an autopsy on Marilyn's body testified at the trial that she had been hit by at least 15 bullets and that she had not been shot in the head. He testified that the fatal wound was the severing of her autonomous artery, "which is one of the main arteries coming off of the aorta just as it leaves the heart, and this would lead to severe hemorrhage shock, and in combination with a hemothorax, which is a collapsed lung, would lead to the

10

victim's death." When asked whether the severing of the artery was caused by one shot or two, the pathologist answered that he was not sure because three entrance wounds to her upper right chest were within about a four-inch circle and any one of them or any one in combination with another could have severed the artery. He stated that she had three wounds to the left side of her left thigh, one of which fractured her femur. Only three of the bullets hit her from the rear: one hit the left back part of her shoulder, one hit the back of her neck, and one hit the back of her right calf. Finally, he said, "It seems most likely to me that the body was in multiple positions during the process of the shootings."

In holding that there were corroborating circumstances that clearly indicated the trustworthiness of the Tira Letter, the district court only considered the contents of the letter. The court did not consider that it contradicted Charboneau's version of what occurred and the forensic evidence.

**Gold statement.** The large envelope contained a typed statement signed by Larry Gold ("Gold Statement"), a former Jerome County Sheriff, in which he stated that his then Chief Deputy, Mito Alanzo [sic],[1] had told him that the elected clerk was in possession of a letter that had been mailed to the Jerome County courthouse; that the letter was addressed to the presiding judge in Charboneau's case; that it had been sent "by Tira Arbaugh, the daughter of Marilyn Arbaugh"; that "the subject matter of this letter had significant relevance concerning the Charboneau case"; and that "Chief Deputy Alanzo [sic] stated that his concern was that the District Court Clerk . . . had requested that he help her to destroy the letter." In his statement, Mr. Gold also said that he had spoken with the Jerome County prosecutor about the clerk's possession of the letter and the "allegations made by Chief Deputy Alanzo [sic] that Cheryl Watts was conspiring to destroy the letter."

Larry Gold had died at some point before these post-conviction proceedings. His statement was dated November 13, 2001, and it was in the form of an affidavit. Its heading was:

SWORN STATEMENT OF<br>
FORMER JEROME COUNTY SHERIFF<br>
LARRY GOLD

STATE OF IDAHO      )
                      )

---

[1] The correct spelling of the surname is "Alonzo."

COUNTY OF JEROME

)  ss
)
)

However, the Gold Statement was not sworn to before a notary public.  Rather it began, "Comes now <u>Larry Gold</u>, I do SWEAR upon my oath and under penalty of perjury that the information and facts provided herein are true and correct to the best of my knowledge and belief."  Idaho did not authorize a certification or declaration under penalty of perjury in lieu of a statement sworn to before a notary public until July 1, 2013.  Mr. Gold had worked in California at some point before he was Jerome County Sheriff, and California has had a provision for a declaration under penalty of perjury for several decades.  Either the document was actually prepared after July 1, 2013, when Idaho law permitted such a declaration, or, while serving as sheriff of Jerome County, Mr. Gold never realized that Idaho law did not provide for a declaration under penalty of perjury.  In connection with Charboneau's third petition for post-conviction relief, he had presented a letter from Larry Gold dated June 3, 2001.

**Balzer statement.**  The large envelope contained a handwritten statement purporting to be signed by Orville Balzer ("Balzer Statement"), who was a former Jerome County deputy sheriff.  The Balzer Statement began, "Letter from Tira Arbaugh / daughter of Marilyn Arbaugh.  Letter addressed to Judge Philip Becker."  It then stated that the postmark on the envelope "indicates the letter was mailed from Bruneau Idaho on September 7, 1989, A.M." and that the letter was given to "Judge Becker's court clerk Cheryl Watts" on September 11, 1989.  The statement asserts that the "Writer witnessed Cheryl Watts open the envelope and read the letter enclosed"; that the "writer" advised her not to shred the letter because that may invite a federal investigation; that a better solution would be "to simply lose the letter in a 'ghost' file"; and that the "writer" later discussed the matter with Chief Deputy Mito Alanzo, who replied:  "'I'm not suprised [sic].  Just another example of Jerome Counties [sic] gunsmoke style justice, remember the Melvin Wright thing.'"

The parties agree that Orville Balzer did not write the Balzer Statement and that it was a forgery.  The district court found that the author of the Balzer Statement was DeWayne Shedd, who worked for the Idaho Department of Corrections as a library specialist at the correction facility in Orofino, Idaho, from 1997 to 2007.  Charboneau was housed at that facility for about nine and one-half years and was transferred from that facility on about April 26, 2011.  The large

12

envelope was discovered by a correctional officer at the Orofino facility on March 18, 2011. Obviously, by forging the Balzer Statement, Mr. Shedd was trying to assist Charboneau to support the contention that the Tira Letter was intercepted by the elected clerk. During his trial testimony, Mr. Shedd denied knowing who Tira Arbaugh was, who Orville Balzer was, who Cheryl Watts was, and who Chief Deputy Mito Alonzo was, even though he named all of them in the Balzer Statement that he had forged. The court found that Mr. Shedd's testimony that he did not know these people was true.

There is nothing in the record indicating how he could have known who those persons were. Someone directed Mr. Shedd regarding what to write when forging the Balzer Statement in order to benefit Charboneau and to lend credence to the assertion that the elected clerk diverted the Tira Letter. As the district court found:

> Shedd did not and could not have acted alone. There is no way that Shedd knew of or could have known of the circumstances surrounding the Tira Arbaugh letter, or the names of the personnel described in Ex.5 [Balzer Statement] allegedly involved with the discovery of the letter in Jerome unless or until he was provided that information by others. He simply had no involvement in Charboneau's original trial or sentencing.

From the record on appeal, the only person who could have done so was Charboneau.

**Shedd note.** The large envelope also included the original of a note written by DeWayne Shedd ("Shedd Note"). In the note dated June 27, 2003, Mr. Shedd wrote that he had been instructed by a deputy attorney general to monitor all of Charboneau's personal mail and his incoming and outgoing legal mail; to look for and seize a letter arriving at the Orofino correctional facility to Charboneau from Larry Gold, without notifying Charboneau; to look for and confiscate any documents "depicting the name Tina Arbaugh"[2] and immediately notify the deputy attorney general, or if he is not available then contact "another attorney Mark Haws at the Federal Court Building." During his trial testimony, Mr. Shedd was asked, "Do you know who Marc Haws is?" and he answered, "No, sir." He also had an amazing lack of memory regarding the note. The note was not purportedly written to anyone. The fact that the original of the Shedd Note and the Balzer Statement that Mr. Shedd forged were in the large envelope discovered by the correctional officer on March 18, 2011, shows that Mr. Shedd was able to put items into that envelope in order to help Charboneau before the large envelope was discovered by the

---

[2] Mr. Shedd testified that he thought the name was "Tina" instead of "Tira."

13

correctional officer. These two items were obviously not in Charboneau's mail that was allegedly intercepted.

There were also two e-mails allegedly from Mr. Shedd to a superior regarding intercepting Charboneau's mail. The district court had those e-mails and the Idaho Department of Correction's e-mail system examined by an expert. In its report, the expert wrote, "Based on other emails found on the system, there is no reasonable scenario that results in these emails being genuine." The expert also wrote that "hardware and word processing software at the ICIO [Idaho Correctional Institution-Orofino] offices were capable of making the changes seen in the emails" and that "[t]he emails in question could have been copied and pasted into any word processor and modified to produce the results we see." The district court wrote that "[t]here is no evidence to suggest that these two emails were or could have been prepared by anyone friendly to Charboneau" and that "there is no explanation as to how Charboneau accomplished that feat." Mr. Shedd had access to the e-mail system, and he forged the Balzer Statement to benefit Charboneau.

The State moved for summary judgment to dismiss this petition for post-conviction relief on the ground that it was barred by Charboneau's third petition for post-conviction relief, and the district court denied that motion. It ultimately granted Charboneau a new trial. It held that Tira's letter was admissible pursuant to Idaho Rule of Evidence 804(b)(3) as a statement against interest (she admitted testifying falsely at Charboneau's trial) and pursuant to Idaho Rule of Evidence 803(24), the catch-all exception to the hearsay rule. The court also ruled that the Gold statement was admissible. The State timely appealed, and Charboneau cross-appealed.

## II.

**Did the District Court Err in Holding that This Petition for Post-Conviction Relief Was Not Barred by the Decision on Charboneau's Third Petition for Post-Conviction Relief?**

"An application for post conviction relief is a special proceeding, civil in nature, distinct from the criminal proceeding which led to the conviction." *State v. Fetterly*, 115 Idaho 231, 233, 766 P.2d 701, 703 (1988). A successive application for post-conviction relief must be filed within a reasonable time after the petitioner has notice of the issue(s) raised in the successive petition, not from the time that the petitioner has sufficient evidence to support the petition. *Charboneau v. State*, 144 Idaho 900, 905, 174 P.3d 870, 875 (2007).

14

The district court in this case held that the failure to produce the Tira Letter constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In its Findings of Fact and Conclusions of Law filed on April 14, 2014, after the court trial, the court wrote:

> There is no evidence as to who had possession of the Tira Arbaugh letter from 1989 to December 2002. Wherever the letter was between 1989 and 2003, it was originally taken or concealed by someone who had the state's purposes in mind, and who acted on behalf of the state, rather than the defendant. There is no evidence as to whether it was or was not delivered to Judge Becker. *Someone* sent or delivered a copy of the letter to Charboneau, who was in IDOC's custody, sometime between December 2002 and September 2003.

(Emphasis in original.)

The court concluded:

> [T]he Tira Arbaugh letter was suppressed or withheld by the State, either willfully or inadvertently, from at least 2003 on, and prejudice to Charboneau has ensued. The Court will leave open for further proceedings the question of whether the letter is "material"--whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of any proceeding would have been different.

Based upon the district court's findings of fact, Charboneau filed a motion for summary judgment on August 4, 2014, seeking to have the court vacate Charboneau's conviction or sentence. In its order on the motion, the district court wrote, "The whereabouts of this letter from 1989 to 2003 are unknown" and "The letter did exist and someone knew about it." The district court held that whether the facts were viewed as a *Brady* violation or newly discovered evidence, Charboneau was entitled to a new trial.

This fifth petition for post-conviction relief asserts the same issues made in Charboneau's third petition for post-conviction relief. As the district court acknowledged in its order on Charboneau's motion for summary judgment: "Charboneau did not, of course, have the Arbaugh letter in 2002 when he made his claims. His claims made in 2002, which he could not support with any direct evidence, turned out to be remarkably similar to what the Arbaugh letter revealed in 2011." The issue in this case is not Tira's Letter. It is her alleged recantation of her trial testimony and her allegations that she had lied during Charboneau's trial at the direction of the prosecution and law enforcement. These same issues were raised in Charboneau's third petition for post-conviction relief, based upon statements that Tira allegedly made to Charboneau's mother.

15

Charboneau's third petition for post-conviction relief was filed on May 23, 2002. The district court in that case stated in its written decision that

petitioner claims there to be newly discovered evidence as follows:

. . . .

(3)    That Tira Arbaugh during the trial and sentencing told petitioner's mother that she and her sister Tiffinie [sic] had been instructed by the prosecutor to withhold certain evidence and testimony relative to the killing of Marilyn Arbaugh

(4)    That Tira Arbaugh had made statements to the brother of the petitioner which incriminated Tiffinie [sic] Arbaugh in the killing of her mother, Marilyn Arbaugh

Charboneau supported that petition with an affidavit of his mother. In her affidavit, she stated, "Tira told me that the tragedy which took the life of her mother on July 1st, 1984 did not happen the way it was played out in court." According to Charboneau's mother, two prosecutors and a Jerome County sheriff's deputy "did instruct her [Tira] on what they wanted her to say regarding the events which took place on July 1st, 1984 in regards to the shooting incident at the EL-Rancho 93 outside of Jerome, which involved my son Jaimi Charboneau, his recent ex-wife and the biological mother to Tira, Marilyn-Arbaugh [sic]." Charboneau's mother asserted that Tira had told her that a prosecutor and an investigator working with law enforcement

had instructed her not to reveal certain facts about things which were found at the scene of the shooting on July 1st, 1984. Tira told me about two things which she said she was instructed to remain silent about they were her mother's holster and, her mother's guns. Tira told me that she had been instructed to say that the only gun that she could remember seeing that day was the rifle.

Charboneau's mother concluded by stating that "I asked Tira if she would be willing to testify in court about that information and, she stated that she would be willing to do so," but she recently passed away.

Thus, in his third petition for post-conviction relief, Charboneau contended that Tira said she had been instructed by two prosecuting attorneys, a deputy sheriff, and an investigator to lie during the trial and that her sister, Tiffnie, was criminally involved in the killing of their mother. He raises the same issues in his fifth petition for post-conviction relief. The district court in Charboneau's third petition for post-conviction relief held that the mother's affidavit was inadmissible hearsay, and Charboneau did not appeal that holding.

16

If Tira's Letter was admissible under Idaho Rule of Evidence 804(b)(3) as a statement against penal interest or under the catch-all exception of Idaho Rule of Evidence 804(b)(6), then so was Charboneau's mother's statement in her affidavit presented in support of his third petition for post-conviction relief. If Tira's out-of-court statements in her letter were admissible, then so were her out-of-court statements allegedly made to Charboneau's mother. Thus, the issue of Tira's alleged recantation and her false testimony given at the direction of two prosecuting attorneys and law enforcement officials was raised and denied in Charboneau's third petition for post-conviction relief, which was filed on May 23, 2002. He cannot raise the same issue over thirteen years later based upon the same statements by Tira in a different form.

In addition, in denying Charboneau's third petition for post-conviction relief, Judge Butler also wrote:

> The Court would also note that if such statements were admissible that it is unlikely that such statements would be unknown to the defendant at the time of his trial, or at sentencing or at his prior post conviction relief hearings. This is because Betsy Crabtree [Charboneau's mother] asserts that such statements were made to her by Tira at the trial and sentencing and this Court is of the belief that it is highly unlikely that if in fact such statements were made that she herself would have withheld such information from her son or his attorney. The Court notes that Ms. Crabtree testified at the petitioner's sentencing hearing and made no such disclosures at that time.

We also note that, as stated above, a successive application for post-conviction relief must be filed within a reasonable time after the petitioner has notice of the issue(s) raised in the successive petition, not within a reasonable the time after the petitioner has sufficient evidence to support the petition. *Charboneau*, 144 Idaho at 905, 174 P.3d at 875. A petition for post-conviction relief must "specifically set forth the grounds upon which the application is based" and "[f]acts within the personal knowledge of the applicant shall be set forth separately from other allegations of facts and shall be verified as provided in section 19-4902." I.C. § 19-4903. The petition must therefore state facts showing that the petitioner brought the successive petition within a reasonable time after receiving notice of the issue(s) raised in the petition. There was no statement in Charboneau's third petition for post-conviction relief as to when he learned of Tira's alleged recantation, nor was there such a statement in this petition. Charboneau's criminal trial began on April 15, 1985. According to his mother, Tira recanted to her during the trial. Tira

17

passed away on September 24, 1998. Thus, there were over fourteen years between Tira's alleged recantation and her death, and the issue of her alleged recantation was not raised.

Finally, with respect to the alleged *Brady* violation, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). There is no showing that the prosecutors in Charboneau's case or others acting on the State's behalf in the case, whether law enforcement or the investigator, knew of the Tira Letter. It is not sufficient to establish a *Brady* violation to simply conclude that the letter was "taken or concealed by someone who had the state's purposes in mind, and who acted on behalf of the state." Likewise, the Tira Letter was not material. Charboneau cannot show materiality unless he can show that there is a reasonable probability that his conviction or sentence would have been different had the Tira Letter been disclosed. *Strickler v. Greene*, 527 U.S. 263, 296 (1999). Forensic and other evidence can be considered in determining whether the Tira Letter was material. *Id.* at 293. The statements in the letter so contradicted Charboneau's own incriminating testimony that the alleged suppression of the letter did not undermine confidence in the outcome of the trial or in his sentence. Charboneau admitted shooting at Marilyn with the Remington rifle while she was unarmed and running away from him; he admitted that he wounded her after which she was sitting on the ground; and he admitted that he had sole control of the Remington rifle from the time that he shot at her to the time that he threw it into the wheat field. The forensic evidence showed that she was shot at least fourteen times with that rifle; that she was shot one additional time probably with that rifle; that she was hit by three bullets coming from her rear; that the killing shots hit her in the upper chest; and that she was not shot either in her head or with a .22 pistol as Charboneau claimed.

With respect to the Larry Gold statement, it is inadmissible hearsay. In that letter, he set forth what he had allegedly been told by Mito Alonzo about the existence of the Tira Letter and its receipt by the Jerome County clerk. In holding that the statement was admissible, the district court wrote, "Gold's affidavit is not being offered *to show or prove the contents of the* [Tira] *letter. The letter is in evidence. Instead, the statement is being offered *to prove Milo Alonzo had very detailed knowledge of the contents of that letter, and when he knew about it.*" (Emphasis in original.)

18

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." I.R.E. 801(c). Larry Gold's statement is hearsay because it was not made while Mr. Gold was testifying at a trial or hearing and it was offered to prove the truth of the matter asserted in the statement—that Mr. Alonzo had made the claimed statements to Mr. Gold and that Mr. Gold had made certain statements to the then prosecuting attorney. The alleged statements by Mr. Alonzo are also hearsay because his alleged statements to Mr. Gold were not made while testifying at a trial or hearing and those statements were offered to prove the truth of the matter asserted—that the Jerome County clerk had a letter written by Tira and addressed to the judge who presided over Charboneau's criminal trial, that the subject of the letter had significant relevance concerning the Charboneau case, and that the clerk asked for Mr. Alonzo's help to destroy that letter. Neither the out-of-court statement by Mr. Gold nor the out-of-court statement by Mr. Alonzo is admissible under any exception to the hearsay rule. Therefore, the Gold statement is inadmissible because it is hearsay within hearsay, and each of the combined statements is not admissible as an exception to the hearsay rule. I.R.E. 805.

Thus, the district court erred in granting a new trial. The issues raised in this case were raised and rejected in Charboneau's third petition for post-conviction relief, and he cannot raise them in this subsequent petition in a different form. We reverse the judgment of the district court and remand this case to the district court with directions to dismiss the petition with prejudice.

Charboneau cross-appealed, contending that the district court erred in denying his motion to preclude retrying or resentencing him. Based upon the dismissal of this petition for post-conviction relief, the cross-appeal is moot.

### III.

### Should We Grant the State's Motion to Revoke Charboneau's Bail?

The judgment entered by the district court set bail for Charboneau in the sum of $20,000, and he bailed out. On February 20, 2016, he was charged in Ada County with burglary and aggravated assault, both of which are felonies. That case is set for a jury trial to commence on October 23, 2017. The State requests that we revoke Charboneau's bail that was set in this case. The order setting bail was in the judgment, which we are reversing. He is currently in custody awaiting trial in his new case. Once the remittitur is issued in this case, the order reversing the

judgment, which includes the order setting bail, will become final. Therefore, under the circumstances we decline to enter an order vacating the bail before this opinion becomes final.

## V.

### Conclusion.

We reverse the judgment of the district court and remand this case with directions to dismiss the petition for post-conviction relief with prejudice.

Justices HORTON, BRODY and Justices Pro Tem SCHROEDER and WALTERS **CONCUR.**