**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAIME DEAN CHARBONEAU, AKA Jaimi Dean Charboneau, | No. 20-35875 |
| *Petitioner-Appellant*, | D.C. No. 1:17-cv-00364-DCN |
| v. | |
| TYRELL DAVIS, acting in his official capacity as Warden of the Idaho State Correctional Institution, | OPINION |
| *Respondent-Appellee*. | |

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted November 7, 2022
Seattle, Washington

Filed December 4, 2023

Before: Sandra S. Ikuta and Daniel P. Collins, Circuit
Judges, and Sidney A. Fitzwater,* District Judge.

Opinion by Judge Collins

---

* The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

# SUMMARY[**]

## Habeas Corpus

The panel affirmed the district court's denial of Jaime Dean Charboneau's second federal habeas corpus petition seeking to set aside his Idaho conviction for the 1984 shooting death of his ex-wife Marilyn Arbaugh after a trial that included inculpatory testimony from Marilyn's daughters Tira and Tiffnie.

In the second federal habeas petition, Charboneau alleged that Idaho officials violated their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by encouraging Tira to provide false statements and testimony regarding her mother's death and to dispose of potentially exculpatory evidence. In support of these allegations, Charboneau relied on a letter written by Tira in 1989, four years after Charboneau's 1985 trial and nine years before Tira's death in 1998. According to Charboneau, the contents of that letter from Tira support his contentions that Tiffnie also fired shots at Marilyn and that, as a result, there is reasonable doubt as to whether Charboneau caused Marilyn's death and as to whether he intended to kill Marilyn.

In order for Charboneau's *Brady* claim to be considered by a federal court on the merits, he faced the threshold requirements that Congress has imposed on the consideration of any "second or successive" federal habeas petition. Under 28 U.S.C. § 2244(b)(2)(B), Charboneau was required to make a showing that (1) he could not have

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

obtained Tira's letter earlier through the exercise of diligence; and (2) the statements recounted in that letter, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense" of first-degree murder.

Like the district court, the panel found it unnecessary to address the diligence issue, because the panel concluded that the new materials, viewed in light of the evidence as a whole, do not suffice to make the showing of actual innocence required by 28 U.S.C. § 2244(b)(2)(B)(ii).

The applicable standard for showing actual innocence set forth in § 2244(b)(2)(B)(ii) was added by the Antiterrorism and Effective Death Penalty Act.

The panel addressed several issues about how that standard is to be applied.

First, the panel held that the statutory command to view the facts underlying the claim in light of the evidence as a whole requires the court to consider the same scope of evidence as described under the test set forth in *Schlup v. Delo*, 513 U.S. 298 (1995)—namely, "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."

Second, the panel held that a habeas court remains free, after taking the proffered "facts" underlying the actual innocence claim as "proven," as required by § 2244(b)(2)(B)(ii), to then assign little probative weight to those statements, either because they are ultimately deemed

to be unreliable or because their probative force is outweighed by other evidence.

Third, the panel concluded that a presumption of correctness attaches under 28 U.S.C. § 2254(e)(1) to any specific factual findings made by the state court that bear on the reliability or authenticity of particular items of evidence that are presented to a federal court that is charged with applying § 2244(b)(2)(B)(ii)'s actual innocence standard.

Applying those standards to Charboneau's claimed showing that he is actually innocent of first-degree murder, and presuming that Tira did in fact author the letter, the panel concluded that Charboneau did not show by clear and convincing evidence that the statements recounted in Tira's letter, considered in light of *all* the evidence, suffice to show that no reasonable factfinder would have convicted him of first-degree murder. Accordingly, Charboneau failed to meet the threshold requirement of § 2244(b)(2)(B)(ii), and the district court properly dismissed his petition without reaching the merits of his *Brady* claim.

## COUNSEL

James K. Ball, Jr. (argued), Manweiler Breen Ball & Davis PLLC, Boise, Idaho, for Plaintiff-Appellant.

L. LaMont Anderson (argued), Deputy Attorney General, Capital Litigation Unit Chief, Criminal Law Division; Lawrence G. Wasden, Idaho Attorney General; Idaho Attorney General's Office, Boise, Idaho; for Defendant-Appellee.

## OPINION

COLLINS, Circuit Judge:

Petitioner-Appellant Jaime[1] Dean Charboneau was convicted in Idaho state court of the 1984 shooting murder of his ex-wife Marilyn Arbaugh after a trial that included inculpatory testimony from Marilyn's daughters Tira and Tiffnie.[2] Although Charboneau's death sentence was vacated on appeal,[3] his conviction was affirmed, and his efforts to obtain post-conviction relief have been thus far unsuccessful. The appeal before us arises from Charboneau's second federal habeas petition, in which he alleges that Idaho officials violated their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by encouraging Tira to provide false statements and testimony regarding her mother's death and to dispose of potentially exculpatory evidence. In support of these allegations, Charboneau relies on a letter written by Tira in 1989, four years after Charboneau's 1985 trial and nine years before Tira's death in 1998. According to Charboneau, the contents of that letter from Tira support his contentions that Tiffnie also fired shots at Marilyn and that, as a result, there is reasonable doubt as

---

[1] In the state court proceedings, Petitioner's first name was generally spelled as "Jaimi." However, Petitioner signed and filed his federal habeas petition in this case using the spelling "Jaime," and that spelling was therefore used by the parties and the district court in these federal proceedings.

[2] Because Marilyn, Tira, and Tiffnie all share the last name of Arbaugh, we will refer to them only by their first names.

[3] On remand, the State elected not to seek the death penalty and Charboneau was sentenced to a fixed term of life imprisonment. *See State v. Charboneau*, 861 P.2d 67, 68–69 (Idaho 1993).

to whether Charboneau caused Marilyn's death and as to whether he intended to kill Marilyn.

Charboneau concedes that, in order for his *Brady* claim to be considered by a federal court on the merits, he must first meet the threshold requirements that Congress has imposed on the consideration of any "second or successive" federal habeas petition. *See* 28 U.S.C. § 2244(b)(2)(B). Under § 2244(b)(2)(B), Charboneau must make a showing that (1) he could not have obtained Tira's letter earlier through the exercise of diligence; and (2) the statements recounted in that letter, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense" of first-degree murder. *Id*. The district court assumed that Charboneau had satisfied the diligence prong, but it concluded that he had not made the showing of actual innocence required by the second prong. Reviewing de novo, we agree and affirm.

# I

## A

Charboneau and Marilyn "were married in June 1983," after living together for about two years. *State v. Charboneau*, 774 P.2d 299, 302 (Idaho 1989), *overruled on other grounds by State v. Card*, 825 P.2d 1081 (Idaho 1991). Their relationship was "stormy" and at times violent: there was evidence that Charboneau abused Marilyn, and Marilyn once shot Charboneau with a pistol during an argument. *Id*. The couple were divorced on June 13, 1984, after about a year of marriage. *Id*. at 302–03.

Eight days after their divorce became final, Charboneau "went to the cafe where Marilyn worked," and "[t]hey left in Marilyn's car." *Charboneau*, 774 P.2d at 303. The following day, "Marilyn reported to the police that [Charboneau] had kidnapped and raped her and had stolen her car." *Id*. As a result, Charboneau was charged in Jerome County, Idaho with kidnapping and grand theft on June 25, 1984. *Id*. Three days later, Charboneau bought a .22-caliber Remington rifle from a hardware store. *Id*.

On July 1, 1984, Marilyn was killed by multiple gunshot wounds outside her home on a ranch near Jerome, Idaho.[4] At around 11:00 AM, "Marilyn went out to check some horses in a corral near her home." *Charboneau*, 774 P.2d at 303. Soon after, Tiffnie (who was then 16 years old) "heard shots outside," retrieved Marilyn's .22-caliber Ruger pistol, and "went to see what had happened." *Id*. She discovered Marilyn "sitting on the ground in the barn with blood on her." *Id*. Charboneau was standing nearby, "with a .22 caliber rifle pointed at Marilyn," who was still alive. *Id*.

Tiffnie left the scene and, at 11:38 AM, called the police and informed them that Charboneau had shot Marilyn. *Charboneau*, 774 P.2d at 303. Tiffnie told her 14-year-old sister Tira what had happened, and "they both got dressed." *Id*. After hearing additional shots, they "ran outside where they hid behind a sheep wagon and called to their mother." *Id*. Tiffnie still "had her mother's .22 caliber pistol with her, and it accidentally discharged behind her." *Id*. She went back to the house, "hid the gun, returned to the sheep wagon, and then ran to the barn," with "Tira follow[ing] close

---

[4] Except as noted, our summary of the facts concerning that murder is based on the Idaho Supreme Court's descriptions of the evidence adduced at Charboneau's trial.

behind." *Id*. At this point, "Marilyn was lying on her back with her arms over her head." *Id*. "The girls ran back" to the house "to call for an ambulance," and at 11:42 AM, Tira called the police and told them to send an ambulance because "her mother was dying." *Id*. When police arrived, they "found Marilyn's body in the barn and located [Charboneau] in a field near the barn with a .22 caliber rifle lying nearby." *Id*. Charboneau "was arrested and charged with first degree murder." *Id*. "At the time of his arrest, [Charboneau] acknowledged that he had shot Marilyn, although he stated that he did so because she was going to shoot him." *Id*.

Forensic evidence introduced at trial showed that Marilyn had been shot 14 times or more. *Charboneau v. State*, 395 P.3d 379, 392 (Idaho 2017).[5] She died of multiple "gunshot wounds to the chest," and "she had not been shot in the head." *Id*. at 386–87. According to the Idaho Supreme Court, all but one of the seven bullet fragments that were recovered from Marilyn's body were identified as having been fired from the .22-caliber Remington rifle that Charboneau had purchased at the hardware store and that he had admitted using to shoot Marilyn. *Id*. The state high court further stated that, as to the remaining recovered bullet fragment (identified as fragment "C" at trial), the State's ballistics expert was not certain that it was fired from that rifle, but he was able to definitively conclude that it was not

---

[5] At one point, the Idaho Supreme Court's opinion states that "[t]he pathologist who performed an autopsy on Marilyn's body testified at the trial that she had been hit by *at least 15* bullets," 395 P.3d at 387 (emphasis added), but the trial transcript of the pathologist's testimony clearly states that "the minimum number of intact projectiles which struck the body is fourteen."

fired from the Ruger pistol that Tiffnie had accidentally discharged behind the sheep wagon. *Id*. at 387.[6]

In various statements, and in his testimony at a pretrial hearing on his motion to dismiss the murder charge against him, Charboneau provided a different account of the events of July 1, 1984. According to Charboneau, he had bought the .22-caliber Remington rifle as a graduation gift for Tira. *Charboneau*, 395 P.3d at 384. He claimed that "he and Marilyn had reconciled and were going to live together again, but that she wanted him to stay in the barn until she broke the news to her daughters." *Charboneau*, 774 P.2d at 303. The Idaho Supreme Court described his testimony at the hearing on the motion to dismiss as follows:

> [Charboneau] testified that when Marilyn came to the barn that morning she picked up the .22 caliber rifle and took it into the house to remove a scope sight that had come with it. He said that Marilyn told him that she was going to tell the girls that day that [he] was there and would let Tira take the gun to the gun range and let her sight it in. [Charboneau] told the court that when Marilyn came back to the barn she had a handful of bullets and loaded the rifle. He said that after going out to the corrals to move some horses, he and Marilyn returned to the barn. He said he asked Marilyn where she

---

[6] The trial transcript states that, in addition to fragment "C," the ballistics expert also could not be certain that bullet fragment "4" had been fired from Charboneau's Remington rifle. He stated that, because that bullet "was completely mangled," the only opinion he could render was "that this is a Remington bullet," and "beyond that I cannot go."

had been all night, and that she told him he thought she was sleeping with every guy in the valley. He stated that Marilyn picked up the rifle, pointed it at him, and told him that he was dead and that no other woman was going to have him. He said he heard a click, grabbed the barrel of the rifle and wrestled it away from her. [Charboneau] testified that Marilyn screamed for Tiffnie to bring Marilyn's shotgun to her, and that when he got the rifle away from Marilyn, she turned around and ran. He said that he saw Tiffnie coming from the house, that he had the rifle at his hip, and that he thought Marilyn might be going to run around and get another gun. He said that he closed his eyes and that the gun went off several times. He opened his eyes and Marilyn was on her knees and bleeding. He said that Marilyn told Tiffnie to leave and that he told Tiffnie to call an ambulance. He testified that as he knelt beside Marilyn, Tiffnie came running toward them with a pistol saying, "I hate both of you guys." He said that Tiffnie fired the pistol two or three times and that he ran out of the barn. He stated that when he realized that Tiffnie was not coming after him he eased back to the barn and heard Tiffnie talking to her mother. He testified that he saw Tiffnie

> standing above her mother, heard the pistol
> go off, and saw Marilyn's hair fly up.

*Id*. at 304–05. The motion to dismiss was denied, and Charboneau was subsequently convicted by a jury of first-degree murder. *Id*. at 305.

Charboneau was originally sentenced to death, but as noted earlier, that sentence was vacated on appeal, and on remand he was resentenced to life in prison. *See State v. Charboneau*, 861 P.2d 67, 68–69 (Idaho 1993). Since his conviction, Charboneau has filed numerous unsuccessful petitions for post-conviction relief in state court. He also filed a petition for a federal writ of habeas corpus, generally alleging ineffective assistance of counsel and challenging the admission of certain evidence at trial. The district court denied the petition, and we affirmed. *Charboneau v. Klauser*, 107 F.3d 15 (9th Cir. 1997) (unpublished table decision).

## B

The current round of post-conviction litigation is based on a mysterious envelope of documents that Charboneau received on March 18, 2011 from a correctional officer, who discovered it "in one of the prison offices." Charboneau asserts that the evidence contained in the envelope showed that the State withheld exculpatory evidence from him in contravention of *Brady*. Because of their importance to this appeal, we will describe those documents at some length.

## 1

The most important document in the envelope is a photocopy of a handwritten letter that was purportedly written by Tira and that bears the date of September 6, 1989.

This "Tira Letter" was addressed to Judge Philip Becker, who had presided over Charboneau's murder trial. *Charboneau*, 395 P.3d at 381. The letter was accompanied by a photocopy of an envelope that was addressed to Judge Becker and was postmarked September 7, 1989. *Id*. at 381–82. The letter generally alleges that police and prosecutors pressured Tira to give false testimony regarding the circumstances of her mother's death and that "some of the things in [her] statements to the police were not all true." According to the letter, on the day of Marilyn's murder, Tira gave a statement to an Officer Driesal, who told her "to only say certain things so that [her] statement wouldn't be confusing" and who instructed her to say "certain things that were not really true." The letter provided the following new version of what had occurred on the day of Marilyn's murder, which was materially different in several respects from the testimony Tira gave at trial.

The letter states that, on the morning of July 1, 1984, Charboneau was at the house and told Tira "that the wrangle horse was waiting on [her]," which was a phrase he used to tell her when she overslept. Marilyn then entered Tira's bedroom and gave her a "big box wrapped in decorative paper," and inside the box was a new .22-caliber rifle. The letter, like Charboneau, claimed that the rifle was a graduation gift from Charboneau.

The letter stated that Marilyn then took a bath and got dressed and that she told Tiffnie and Tira "that she was going outside to help [Charboneau] with the horses." Tira went to take a bath, and shortly thereafter she heard gunshots. Tiffnie then came running into the bathroom and screamed at Tira to get dressed. Tiffnie grabbed Tira's new .22-caliber rifle and gave Tira one of Marilyn's .22-caliber pistols, and the girls then went outside and hid behind the sheep wagon.

Tira could see Marilyn in an alleyway by a feed canal, but she did not see Charboneau and could only hear his voice. Tira heard Tiffnie shoot the rifle while they were behind the sheep wagon. Startled by the sound, Tira accidentally fired the pistol. Tiffnie then told Tira that Marilyn had taken a different .22-caliber rifle nicknamed "Calamity Jane" with her when she went outside with Charboneau.

The letter further stated that, a few days after Tira gave her statement to Officer Driesal, a different officer, Larry Webb, visited Tira at her grandfather's house. Officer Webb told Tira that she had "forgotten to write down some important things in [her] statement." He instructed Tira to add that she and Tiffnie "had heard 6 or 8 more shots" after they went back into the house. Tira signed another statement to that effect, "even though [she] knew it was not true."

The letter also recounted an alleged incident in which Marc Haws, the "new prosecutor from Boise," told Tira that she "need[ed] to get rid of [Marilyn's] Calamity Jane rifle." The letter stated that Tira did not know why Haws had asked her to do this, but that she, along with her grandfather and her uncle, buried Calamity Jane behind a potato cellar.

After the signature line, the letter contained a postscript stating that Tira was in Bruneau, Idaho "for a cowboy benefit [and] street dance" and that she would return to Jerome, Idaho "early next week."

## 2

There were several additional documents in the mysterious envelope found at the state prison. One was a handwritten statement purportedly composed by former Jerome County deputy sheriff Orville Balzer. *Charboneau*, 395 P.3d at 388. The statement claims that Balzer saw Judge

Becker's clerk Cheryl Watts open and read the Tira Letter and that Balzer then told Watts to "lose the letter in a 'ghost' file." *Id*. Charboneau concedes that this "Balzer Statement" was forged, as expressly found by the Idaho state court in connection with Charboneau's latest round of post-conviction challenges. *Id*. Specifically, the Idaho trial court determined that the true author of the statement was DeWayne Shedd, a library specialist for the Idaho Department of Corrections who worked at the state prison in Orofino from 1997 to 2007; Charboneau was housed there from approximately late 2001 until April 2011. *Id*. Shedd gave testimony in which he denied knowing who Tira, Balzer, or Watts were. *Id*. The Idaho Supreme Court held that, given Shedd's lack of knowledge concerning the matters set forth in the Balzer Statement, someone must have assisted him in preparing it, and that "the only person who could have done so was Charboneau." *Id*.

The envelope also contained a typed affidavit purportedly from former Jerome County Sheriff Larry Gold, who (like Tira) was already deceased at the time the envelope was found. *Charboneau*, 395 P.3d at 387. The statement, dated November 13, 2001, claimed that Sheriff Gold's Chief Deputy had informed him that the clerk of court was in possession of a letter sent by Tira to "the presiding judge in Charboneau's case," and that the Chief Deputy was concerned that the clerk had asked for his help in destroying the letter. *Id*. The Idaho Supreme Court noted that the affidavit "was not sworn to before a notary public," even though "Idaho did not authorize a certification or declaration under penalty of perjury in lieu of a statement sworn to before a notary public until July 1, 2013." *Id*. at 387–88. The Court concluded that this meant that "[e]ither the document was actually prepared after July 1, 2013, when

Idaho law permitted such a declaration, or, while serving as sheriff of Jerome County, Mr. Gold never realized that Idaho law did not provide for a declaration under penalty of perjury." *Id*. at 388.

Finally, the envelope contained several more documents. One was a note dated June 27, 2003, in which Shedd stated that he had been told by a prosecutor to monitor Charboneau's mail, to "look for and seize" a letter arriving from Sheriff Gold, and to "confiscate any documents" referencing Tira. *Charboneau*, 395 P.3d at 388–89. The envelope also contained two emails, purportedly printed from the Idaho Department of Corrections system, "from Mr. Shedd to a superior regarding intercepting Charboneau's mail." *Id*. at 389. However, an expert concluded, in connection with the state post-conviction proceedings, that there was "no reasonable scenario that results in these emails being genuine." *Id*. The state trial court suggested that these "Shedd Emails," even if forged, could not have been prepared "by anyone friendly to Charboneau," but the Idaho Supreme Court expressly disagreed, reasoning that Shedd had access to the email system and had forged at least one other document (*viz.*, the Balzer Statement) to "benefit Charboneau." *Id*.

## C

Charboneau filed a state petition for post-conviction relief based on the materials in the newly discovered envelope. The trial court concluded that the Tira Letter had been written by Tira and that it had been "suppressed or withheld by the State, either willfully or inadvertently, from at least 2003 on, and [that] prejudice to Charboneau ha[d] ensued." *Charboneau*, 395 P.3d at 390. The trial court

therefore granted Charboneau's petition and ordered a new trial.  *Id*. at 389.

In May 2017, the Idaho Supreme Court reversed.  The court held, *inter alia*, that, even if genuine, the Tira Letter was not material *Brady* evidence because there was not a "reasonable probability that [Charboneau's] conviction or sentence would have been different had the Tira Letter been disclosed."  *Charboneau*, 395 P.3d at 391.  The court noted, *inter alia*, that the claims made in the Tira Letter were inconsistent in several respects with Charboneau's testimony at the hearing on his motion to dismiss and that "the forensic evidence contradicts both of their versions."[7] *Id*. at 382; *see also id*. at 392.  The state high court also noted that some of the statements in the Tira Letter were contradicted by testimony that had been offered by Tira's husband in the state post-conviction proceedings as well as with other evidence about the timing of events recounted in the letter.  As the Idaho Supreme Court explained:

> The letter stated, "I am in Bruneau Idaho for a cowboy benefit + street dance where the Pinto Bennetts band is providing the music" and "I will be back in Jerome early next week."  The street dance did not occur until ten days after the date of the letter.  Tira's husband testified that in September of 1989 he and Tira were living on a ranch in Wells, Nevada; that he was working on the ranch and she usually worked with him; that they did not have a car; that he had never been to a street dance in Bruneau; that during their

---

[7] These contradictions will be discussed in greater detail below.  *See infra* at 35–38.

> marriage he and Tira had never spent the night apart except for one week during Christmas of 1989; that she signed the letter with her maiden name, which she had not used as long as he had known her; and that by September 1989 they had a child.

*Id*. at 382.

In September 2017, Charboneau submitted a petition for a writ of habeas corpus in the United States District Court for the District of Idaho, arguing that the State had violated *Brady* by failing to disclose the information summarized in the Tira Letter "at his original trial." Because Charboneau had previously filed an unsuccessful federal habeas petition in the 1990s, his petition was accompanied by an application for leave to file a "second or successive" habeas petition. Under 28 U.S.C. § 2244(b)(3)(A), such a petition may not be filed in the district court until the petitioner first obtains an order from the "appropriate court of appeals" that "authoriz[es] the district court to consider" the petition. A three-judge panel of the court of appeals, acting within 30 days, "may authorize the filing of a second or successive [petition] only if it determines that the [petition] makes a prima facie showing that the [petition] satisfies the requirements of" the statute. *Id*. § 2244(b)(3)(C)–(D). As applicable here, those requirements include a showing that the "factual predicate for the claim" could not have been diligently discovered earlier and that the "facts underlying the claim" establish a sufficient showing as to the petitioner's professed actual innocence. *Id*. § 2244(b)(2)(B). On September 18, 2018, more than a year after the application to file a second or successive petition was transferred to this court, a three-judge panel of this court

granted Charboneau's application and authorized the filing of this petition. *See Ezell v. United States*, 778 F.3d 762, 764–65 (9th Cir. 2015) (holding that § 2244(b)(3)(D)'s 30-day time limit for the court of appeals to act on such an application "is hortatory" rather than "mandatory").

As the district court correctly recognized, this court's earlier determination that Charboneau had made a sufficient prima facie showing concerning the requirements of § 2244(b)(2)(B) does *not* eliminate those requirements from further consideration. On the contrary, the statute expressly states that "[a] district court shall dismiss any claim presented in a second or successive [petition] that the court of appeals has authorized to be filed unless the applicant *shows* that the claim satisfies the requirements of" the statute. 28 U.S.C. § 2244(b)(4) (emphasis added); *see also United States v. Villa-Gonzalez*, 208 F.3d 1160, 1163–64 (9th Cir. 2000) (expressly rejecting, as contrary to § 2244(b)(4), the contention that "our grant of permission" to file a second or successive petition "forecloses the district court from finding [the petition] does not meet the statutory requirements").

Accordingly, the district court considered, in light of the record as a whole, whether Charboneau's latest federal petition met the applicable requirements of 28 U.S.C. § 2244(b)(2)(B). As noted, the relevant provision of that statute precludes a district court from considering the merits of a "second or successive" habeas petition unless the petitioner first makes a threshold showing of diligence and actual innocence. Concluding that Charboneau had failed to show actual innocence, the district court dismissed the petition.

We granted Charboneau's request for a certificate of appealability, limited to two issues: (1) "whether [Charboneau's] petition meets the standards of 28 U.S.C. § 2244(b)(2)," and, if so, (2) "whether the state violated [Charboneau's] right to due process by failing to disclose exculpatory evidence in violation of *Brady*." We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We review the district court's decision de novo. *See Villa-Gonzalez*, 208 F.3d at 1165.

## II

Charboneau does not dispute that his current federal habeas petition is a "second or successive" petition within the meaning of 28 U.S.C. § 2244(b)(2) and that he therefore had to satisfy the requirements of that statute. Specifically, with respect to a second or successive petition, such as Charboneau's, that raises a claim that has *not* been presented in a prior petition, § 2244(b)(2) provides as follows:

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). By its terms, the statute requires that such a petition be dismissed unless one of two alternative threshold showings is made. Charboneau has not contended that the first alternative—concerning certain "new rule[s] of constitutional law"—is applicable here, and we therefore address only the second. Under that latter alternative, the petitioner's claim may be considered only if the petitioner "shows," *id*. § 2244(b)(4), that (1) the claim rests on a newly discovered "factual predicate" that "could not have been discovered previously through the exercise of due diligence"; and (2) the "facts underlying the claim" sufficiently demonstrate the petitioner's innocence in the sense described by the statute, *id*. § 2244(b)(2)(B).

The district court assumed *arguendo* that the "factual predicate" of Charboneau's *Brady* claim—*viz*., the information contained in the Tira Letter and other materials in the envelope found in the prison—could not have been diligently discovered earlier, but the court concluded that the requisite showing as to innocence had not been made. Like the district court, we find it unnecessary to address the diligence issue, because we conclude that the new materials presented by Charboneau, "viewed in light of the evidence as a whole," do not suffice to make the showing of actual innocence required by § 2244(b)(2)(B)(ii).

**A**

The standard for showing actual innocence set forth in § 2244(b)(2)(B)(ii) was added to that statute by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 106, 110 Stat. 1214, 1220–21 (1996). To understand the significance of the language chosen by Congress in defining that standard, it is helpful first to set forth the principles that governed second or successive habeas petitions at the time that AEDPA was enacted.

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court reaffirmed its prior holdings that a federal court could reach the merits of claims presented in a second or successive habeas petition only if the petitioner could either (1) "establish cause and prejudice sufficient to excuse his failure to present his evidence in support of his first federal petition" or (2) show that his case fell "within the narrow class of cases implicating a fundamental miscarriage of justice." *Id*. at 314–15 (simplified). "To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, th[e] [Supreme] Court explicitly tied the miscarriage of justice exception to the petitioner's *innocence*." *Id*. at 321 (emphasis added).

Although the Supreme Court's cases had variously articulated the showing of actual innocence required to invoke this miscarriage-of-justice exception, the *Schlup* Court endorsed the formulation used in *Murray v. Carrier*, 477 U.S. 478 (1986), which had stated that a procedurally defaulted claim could be considered on the merits "in an extraordinary case, where a constitutional violation has

*probably* resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 321 (quoting *Carrier*, 477 U.S. at 496 (emphasis added)); *see also id*. at 326–27. *Schlup* noted that, in *Sawyer v. Whitley*, 505 U.S. 333 (1992), the Court had adopted a "more exacting" standard for showing "actual innocence" in the context of a claim that, but for constitutional error, a petitioner would have been ineligible for the death penalty (as opposed to being innocent of the underlying crime). *Schlup*, 513 U.S. at 323 (citing *Sawyer*, 505 U.S. at 336). In this latter context, *Sawyer* "held that a habeas petitioner 'must show by *clear and convincing* evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty.'" *Id*. (quoting *Sawyer*, 505 U.S. at 336 (emphasis added by *Schlup*)). *Schlup* concluded that *Sawyer*'s heightened standard was limited to claims that a petitioner's "*sentence* is too severe" and that the "correspondingly greater injustice that is implicated by a claim of actual innocence" of the *underlying offense* "requires application of the *Carrier* standard." *Id*. at 325–26 (emphasis added). Accordingly, *Schlup* held that the merits of a second or successive petition could be considered, under the miscarriage-of-justice exception, if the petitioner "show[s] that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id*. at 327 (quoting *Carrier*, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*.

In enacting AEDPA, Congress took direct aim at *Schlup*'s standard for allowing merits consideration of second or successive petitions. Congress abrogated *Schlup*'s core holding by expressly adopting the *Sawyer* "clear and

convincing evidence" standard that *Schlup* had rejected. *See* 28 U.S.C. § 2244(b)(2)(B)(ii). In addition, Congress required the petitioner "to satisfy a diligence requirement that did not exist prior to AEDPA's passage." *McQuiggin v. Perkins*, 569 U.S. 383, 396 (2013). As we summarized in our en banc decision in *Cooper v. Woodford*, 358 F.3d 1117 (9th Cir. 2004):

> The AEDPA requirements for a second or successive application are stricter than the *Schlup* standard in two ways. First, § 2244(b)(2)(B)(i) requires that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." There is no requirement under *Schlup* that the factual claim was not discoverable through the exercise of due diligence. Second, § 2244(b)(2)(B)(ii) requires that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish *by clear and convincing evidence* that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (Emphasis added.) *Schlup* requires only that an applicant show that it is "more likely than not" that no reasonable fact-finder would have found him guilty.

*Id*. at 1119.

Given that "the *Schlup* standard" is itself "demanding and permits review only in the extraordinary case," *House v.*

*Bell*, 547 U.S. 518, 538 (2006) (citations and internal quotation marks omitted), it is unsurprising that § 2244(b)(2)(B)'s "stricter" standard, *see Cooper*, 358 F.3d at 1119, has been described as "almost insurmountable." *Douglas v. Workman*, 560 F.3d 1156, 1192–93 (10th Cir. 2009); *see also Brown v. Muniz*, 889 F.3d 661, 675 (9th Cir. 2018) ("[F]ew applications to file second or successive petitions survive § 2244(b)'s substantive and procedural barriers." (simplified)). But § 2244(b)(2)(B)(ii)'s actual innocence standard is not wholly insurmountable, and so it remains for us to consider whether this is the truly extraordinary case in which the petitioner has made the requisite showing.

## B

However, before applying AEDPA's stricter actual innocence standard to the specific facts of this case, we must address several further issues about how that standard is to be applied.

## 1

First, the parties disagree as to the scope of the evidence that we should consider in applying § 2244(b)(2)(B)(ii). The statute says that we must consider whether the "facts underlying the claim, if proven and *viewed in the light of the evidence as a whole*, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). Charboneau urges us to follow the Tenth Circuit's decision in *Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013), which held that "the universe of facts that enter into the subparagraph (B)(ii) analysis consists *only* of evidence presented at the time of trial, adjusted for evidence that

would have been admitted or excluded 'but for constitutional error' during trial proceedings." *Id*. at 1038. Under that standard, Charboneau argues, we may not consider the testimony that he offered during a pretrial hearing in November 1984 that was *not* presented at his subsequent trial. We reject this contention.

In *Case*, the Tenth Circuit held that, in the context of a second or successive petition alleging a *Brady* violation, the court could only consider the exculpatory evidence allegedly improperly withheld and the evidence presented at trial— meaning that the court could *not* consider additional exculpatory evidence, such as "subsequently produced DNA evidence" and "post-trial witness recantations" that were unconnected to any alleged constitutional error. 731 F.3d at 1038–39. *Case* based this holding on two aspects of the language in § 2244(b)(2)(B)(ii) that require a nexus between the constitutional claim and the showing of actual innocence. Specifically, (1) the statute requires the petitioner to show that "*the facts underlying the claim* . . . would be sufficient to establish" the petitioner's innocence "by clear and convincing evidence"; and (2) the statute provides that the standard for showing the petitioner's innocence is that, "*but for constitutional error*, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added); *see also Case*, 731 F.3d at 1033–34. Given this required linkage between the facts underlying the claim of constitutional error and the showing of actual innocence, the Tenth Circuit reasoned, "the inquiry" under § 2244(b)(2)(B)(ii) must be understood to "exclude[] any consideration of evidence not rooted in constitutional error at trial." *Id*. at 1034.

We agree with *Case* insofar as it held that the statutory language unambiguously requires a nexus between the new

factual predicate underlying the constitutional claim and the showing of actual innocence. As we have explained, the ultimate question under the statute is whether, "*but for* constitutional error,*"* the "*facts underlying the claim . . .* would be sufficient to establish by clear and convincing evidence" that no reasonable factfinder would have convicted. 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). Thus, it would not be sufficient, under § 2244(b)(2)(B)(ii), to present an *immaterial* constitutional error coupled with an *independent* showing of actual innocence. For example, a petitioner could not satisfy § 2244(b)(2)(B)(ii) by (1) presenting a claim that a newly discovered recording of his post-arrest stationhouse interview proves that certain relatively trivial statements introduced at trial were not voluntarily made; and (2) presenting new DNA evidence attesting to his innocence. Although, in this example, the petitioner's DNA evidence might convincingly establish his actual innocence, the statute's requirements would not be satisfied, because the "facts underlying the claim" of a coerced but trivial statement would not "be sufficient to establish" his innocence in the sense that, "but for" that statement, no reasonable jury would have convicted. *Id*.

But it does not follow from this premise that, in assessing whether this statutory nexus requirement has been satisfied, the federal habeas court should close its eyes to any other evidence in the record. On *that* specific question, the statutory language points in the opposite direction. It says that, in determining whether "the facts underlying the claim" have the required connection to a showing of actual innocence, the court must view those facts "*in light of the evidence as a whole*." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). Nothing in the broad wording of that italicized phrase suggests that, in determining whether the

required nexus has been shown, a court may consider only the "facts underlying the claim" and "the *trial* evidence as a whole." Had Congress intended to impose such a limitation, it could easily have added that simple word. But it did not do so, and we cannot rewrite the statute to insert an additional restriction that Congress omitted.

Congress's failure to add any such limitation is all the more significant because the *Schlup* standard that Congress consciously amended in § 2244(b)(2)(B)(ii) clearly did *not* contain such a limitation. As *Schlup* itself explained:

> The *Carrier* standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, *the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial*. Indeed, with respect to this aspect of the *Carrier* standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably

> claimed to have been wrongly excluded or to
> have become available only after the trial."

513 U.S. at 327–28 (emphasis added) (citation omitted); *see also House*, 547 U.S. at 538 ("*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." (citations and internal quotation marks omitted)); *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (same).

Although, as we have noted, Congress included language in § 2244(b)(2)(B)(ii) clarifying that the showing of actual innocence must be tied to the "facts underlying the claim," it did not add any language that can be said to have otherwise overturned *Schlup*'s clear holding that the requisite standard must be applied "*in light of all the evidence*" in the record, regardless of whether it was presented at trial.  *Schlup*, 513 U.S. at 328 (emphasis added) (citation omitted).   On the contrary, Congress used the comparable phrase "in light of the evidence as a whole," 28 U.S.C. § 2244(b)(2)(B)(ii), which strongly reinforces the conclusion that § 2244(b)(2)(B)(ii) leaves that specific aspect of *Schlup* undisturbed. *See United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011) (likewise concluding that § 2244(b)(2)(B)(ii) preserves this aspect of *Schlup* because, "by its plain language, 'the evidence as a whole' means, in the equivalent language of *Schlup*, 'all the evidence'" (quoting *Schlup*, 513 U.S. at 328)).   Because "Congress legislates against the backdrop of existing law," *McQuiggin*, 569 U.S. at 398 n.3, Congress's choice of language confirms its intention to retain *Schlup*'s rule that, in applying the

requisite actual innocence standard, all evidence is to be considered.

Moreover, adopting the Tenth Circuit's contrary construction of the statute would thwart the objectives of § 2244(b)(2)(B)(ii)'s demanding standard, which narrowly defines the class of cases in which refusal to entertain a second or successive petition could be said to result in a "fundamental miscarriage of justice." *Schlup*, 513 U.S. at 324. As the Supreme Court explained in *Schlup*, the already stringent pre-AEDPA actual innocence standard sought to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case" of "a substantial claim that constitutional error has caused the conviction of an innocent person." *Id*. Those weighty interests in finality would be seriously undermined by a rule that would require courts to close their eyes to substantial evidence of *guilt* simply because that evidence was not presented at trial and does not form part of the factual predicate for the petitioner's new claim. Put simply, the Tenth Circuit's constrictive view of the evidence that may be considered would require a court to treat as "actually innocent," and deserving of a further habeas petition, a petitioner who, based on *other* evidence, was known to be actually guilty. Conversely, we also see no reason why, in attempting to show that the newly discovered factual predicate underlying the constitutional error has the requisite nexus with the claim of actual innocence, a petitioner cannot *bolster* that nexus showing with additional evidence of actual innocence. Either way, the non-textual constraint that *Case* places on the evidence that may be considered under § 2244(b)(2)(B)(ii) would distort the application of the

statutory standard in ways that threaten to significantly impede the statute's objectives.

Accordingly, we hold that the statutory command to "view[]" the "facts underlying the claim . . . in light of the evidence as a whole," 28 U.S.C. § 2244(b)(2)(B)(ii), requires the court to consider the same scope of evidence as described under the *Schlup* test—namely, "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 538 U.S. at 538 (citations and internal quotation marks omitted). On that point, we align ourselves with the Fourth and Sixth Circuits. *See MacDonald*, 641 F.3d at 612 (stating that "a court must make its § 2244(b)(2)(B)(ii) . . . determination—unbounded by the rules of admissibility that would govern at trial— based on all the evidence, including that alleged to have been illegally admitted and that tenably claimed to have been wrongly excluded or to have become available only after the trial" (simplified)); *Clark v. Warden*, 934 F.3d 483, 496 n.5 (6th Cir. 2019) (expressly agreeing with *MacDonald* on this point).

## 2

Second, we address what the statute means when it says that, in assessing the petitioner's showing of actual innocence, the court must assume that "the facts underlying the claim" have been "proven." 28 U.S.C. § 2244(b)(2)(B)(ii) (requiring the court to consider what would be shown by "the facts underlying the claim, if proven and viewed in light of the evidence as a whole").

It is clear from the statutory context that the "facts" being referenced are the specific evidentiary facts underlying the claim (*e.g.*, that a particular witness has given statements

recanting prior testimony or that a particular forensic test produced specific results under specified conditions) and not the *ultimate* "facts" (*e.g.*, that the petitioner did not commit the criminal acts). In particular, the statute's focus on evidentiary facts is clear from its express instruction to consider "the facts underlying the claim . . . in light of the evidence as a whole." 28 U.S.C. § 2244(b)(2)(B)(ii). The requirement to consider the petitioner's newly developed "facts" in light of the other available "evidence" denotes an apples-to-apples comparison of *competing items of evidence*. By contrast, taking the *ultimate* facts as "proven" would render the strictures of § 2244(b)(2)(B)(ii) a dead letter: if, at the outset of the statutory inquiry, the ultimate fact of innocence is itself assumed to be "proven," then an outcome in the petitioner's favor would be essentially foreordained. That is plainly not what the statute means.

Moreover, *Schlup* similarly described the actual innocence inquiry as involving a weighing of competing items of evidence, and there is no indication in the language of § 2244(b)(2)(B)(ii) that Congress sought to alter that aspect of the *Schlup* test. Specifically, *Schlup* states that the petitioner must "support his allegations of constitutional error with new reliable *evidence*—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324 (emphasis added). The habeas court then must "consider the probative force" of that evidence "in light of all the evidence," and in doing so it must consider the "unreliability" of any particular items of new evidence. *Id*. at 327–28. Because the *Schlup* test explicitly requires the court to assess the probative value and reliability of the petitioner's evidence in light of all of the evidence, that test obviously does not require the court to take as true the

ultimate facts that the petitioner's evidence seeks to prove. And because Congress did not add any language to the statute that would negate this aspect of the *Schlup* test, we conclude that the "facts" that are to be taken as "proven" under § 2244(b)(2)(B)(ii) are not the ultimate facts, but simply the evidentiary proffer underlying the claim— namely, that a particular witness made a given statement at a given time or that a specific document contains certain statements. Accordingly, a habeas court remains free, after taking those particular proffered "facts" as "proven," to then assign little probative weight to those statements, either because they are ultimately deemed to be unreliable or because their probative force is outweighed by other evidence.

One final issue concerns the extent to which, in evaluating the foundational reliability of the petitioner's new evidence, a federal habeas court applying § 2244(b)(2)(B) should give deference to any findings concerning authenticity that were made by the state courts. In *King v. Trujillo*, 638 F.3d 726 (9th Cir. 2011), we held that the presumption of correctness that applies to "a determination of a factual issue made by a State court" under 28 U.S.C. § 2254(e)(1) applies when a federal court is assessing whether a second or successive habeas petition meets the requirements of § 2244(b)(2)(B). *See King*, 638 F.3d at 732 & n.30 (applying § 2244(e)(1)'s presumption of correctness to state court factual findings in considering whether the petitioner had met the diligence requirement of § 2244(b)(2)(B)(i)). Accordingly, we conclude a presumption of correctness attaches under § 2254(e)(1) to any specific factual findings made by the state court that bear on the reliability or authenticity of particular items of evidence that are presented to a federal court that is charged

with applying § 2244(b)(2)(B)(ii)'s actual innocence standard.

## III

Having set forth at length what § 2244(b)(2)(B) requires, we now apply those standards to Charboneau's claimed showing that he is actually innocent of first-degree murder. Charboneau argues that, but for the alleged *Brady* violation, every reasonable factfinder would have had reasonable doubt as to (1) whether Charboneau or Tiffnie fired the fatal shot; or (2) whether, if Charboneau did fire the fatal shot, he intended to kill her.

As an initial matter, we note that only the "Tira Letter" provides any potential factual support for Charboneau's claim of actual innocence. The remaining documents—the "Balzer Statement" allegedly prepared by a deputy sheriff; the "Shedd Note" prepared by Shedd; the "Shedd Emails" that purportedly recount email communications between Shedd and a supervisor; and the "Gold Statement," an affidavit assertedly signed by a since-deceased sheriff—bear only on Charboneau's claim that the allegedly exculpatory Tira Letter was suppressed by state officials.[8] Accordingly, we focus on the contents of the Tira Letter.

The state trial court specifically found that the Tira Letter was a copy of a lost original that was actually handwritten by Tira. The Idaho Supreme Court did not directly reject that finding, but it pointedly declined to accept the *contents* of that letter as persuasive or reliable. On the contrary, the state high court noted at length that the contents of the letter were contradicted by many other items of evidence in the

---

[8] As we note below, however, the forged nature of some of these documents provides a consideration that may weigh *against* a finding of actual innocence here. *See infra* at 38–39.

record, including "Charboneau's version of what occurred," the forensic evidence, and the testimony of Tira's husband. *See Charboneau*, 395 P.3d at 382, 387. As to the latter point, Charboneau concedes on appeal that the "Idaho Supreme Court rejected the state district court's finding that Tira's husband's testimony was not credible." Accordingly, we presume, in accordance with the state court's findings, only that Tira *authored* the Tira Letter. Beyond that, the Idaho Supreme Court simply noted the multiple contradictions between the Tira Letter and the other record evidence, and it did not purport to make affirmative factual findings resolving those contradictions one way or the other. Although the trial court had at least arguably partially made such a finding in specifically rejecting the contrary testimony of Tira's husband, the Idaho Supreme Court in turn rejected that finding as unsupported. Accordingly, in applying § 2244(b)(2)(B)(ii), we presume that Tira did in fact author the letter, but we independently assess its ultimate reliability and probative value.

For several reasons, we conclude that Charboneau has not shown by clear and convincing evidence that the statements recounted in the Tira Letter, considered in light of *all* the evidence, suffice to show that no reasonable factfinder would have convicted him of first-degree murder.

First, a reasonable factfinder could readily conclude that the veracity and reliability of Tira's assertions in the letter are undermined by her husband's testimony in the state post-conviction proceedings. Tira claimed in the letter, which was dated September 6, 1989 and postmarked September 7, 1989, that she was in Bruneau, Idaho for a street dance and would return to Jerome, Idaho "early next week." *Charboneau*, 395 P.3d at 382. But that would have been impossible, given that the referenced street dance did not

occur until ten days later.  *Id*.  Moreover, "Tira's husband testified that in September of 1989 he and Tira were living on a ranch in Wells, Nevada," and not in Jerome, Idaho.  *Id*.  Furthermore, he testified that he never went to a street dance in Bruneau and that he did not spend a night away from Tira during September 1989.  *Id*.  He also found it odd that Tira had "signed the letter with her maiden name, which she had not used as long as he had known her."  *Id*.  Even though we are bound by the state trial court's finding that Tira did write the letter, these contradictions raise serious questions about her overall credibility and her state of mind at the time she wrote the letter.  A reasonable factfinder could rely on these discrepancies as a basis for rejecting the substantive allegations in the letter.  *See Modern Mills, Inc. v. Havens*, 739 P.2d 400, 404 (Idaho Ct. App. 1987) (noting that "the fact-finder may reject the additional, noncorroborated testimony of an impeached witness" (emphasis omitted)).

Second, as the Idaho Supreme Court correctly noted, there are numerous inconsistencies between the Tira Letter and Charboneau's own testimony at the pretrial hearing.  The Tira Letter claims that, on the morning of the murder on Sunday, July 1, 1984, Charboneau was in Marilyn's house and was present when Marilyn gave Tira a new .22-caliber rifle as a graduation present.  *Charboneau*, 395 P.3d at 383, 386.  By contrast, Charboneau testified that he had been staying in the "tack room" of the barn since Thursday with the knowledge of Marilyn but not of her daughters and that Marilyn did *not* leave the rifle with Tira on Sunday morning.  *Id*. at 384–86.  The Idaho Supreme Court also noted that "Tira wrote that Tiffnie took Tira's .22 rifle, gave her their mother's .22 pistol, and [that] they both went outside and hid behind the sheep wagon," but that "Charboneau's version was that only Tiffnie came out of the house; she had a .22

pistol, not the rifle; and she did not hide behind the sheep wagon." *Id*. at 386. Importantly, Tira's letter only once mentions Tiffnie shooting, saying that she "heard Tif shoot the rifle while [they] were behind the sheep wagon." *Id*. at 384. By contrast, Charboneau testified that Tiffnie shot Marilyn with a pistol and that she did so "standing up above her mother" while she pleaded, "Tiffy, I'm your mother." *Id*. at 386. These numerous inconsistencies would provide an ample reasonable basis for a factfinder to choose to disbelieve the Tira Letter, Charboneau's testimony, or both.

Third, the 1989 Tira Letter differed in numerous respects from Tira's testimony at the 1985 trial. As we have observed in applying the *Schlup* standard, "[w]itness recantations are generally viewed with suspicion." *Gable v. Williams*, 49 F.4th 1315, 1323 (9th Cir. 2022). "To measure a recantation's likely effect on a juror," we may consider its "context" and "timing," as well as the surrounding "circumstances." *Id*. At trial, Tira testified that Tiffnie took a pistol, not a rifle, and she did not say anything about Tira herself having a firearm. *Charboneau*, 395 P.3d at 382–83. Moreover, she testified that the single shot Tiffnie fired by the sheep wagon occurred when the pistol went off while Tiffnie was holding it while "*[h]er hands were behind her back*." *Id*. at 383 (emphasis added). By contrast, in the letter, Tira stated that she heard "Tiffnie shoot the *rifle*" and that the sound so startled her that *Tira* then "accidentally" fired the "pistol." *Id*. at 384 (emphasis added). Considering the other potential errors in the Tira Letter noted earlier, a factfinder would have reasonable grounds to credit Tira's trial testimony over her unsworn, years-after-the-fact partial recantation.

Moreover, these various conflicts between the Tira Letter and the testimony of Tira's husband, Charboneau, and

Tira herself must also be considered in light of the other evidence of guilt in the record. *Gable*, 49 F.4th at 1323. On June 25, 1984—less than a week before the murder—Charboneau was charged with having kidnapped Marilyn shortly after their divorce was finalized. *Charboneau*, 395 P.3d at 381 (citation omitted). Three days later, Charboneau bought a .22 caliber Remington rifle "from a hardware store in Gooding, Idaho." *Id.*; *see also id.* at 384. When sheriff's deputies arrived after the murder, they found Charboneau "in a field near the barn with a .22 caliber rifle lying nearby." *Id.* (citation omitted). Moreover, as the Idaho Supreme Court noted in summarizing Charboneau's testimony at the pretrial hearing:

> Charboneau admitted shooting at Marilyn with the Remington rifle while she was unarmed and running away from him; he admitted that he wounded her after which she was sitting on the ground; and *he admitted that he had sole control of the Remington rifle from the time that he shot at her to the time that he threw it into the wheat field*.

*Id.* at 392 (emphasis added).

As to the seven bullet fragments found in Marilyn's body, ballistics evidence at trial was able to identify all seven as being from Remington-brand bullets, and five of them were specifically identified as having been fired from the Remington rifle found near Charboneau in the field. Although the remaining two could not be conclusively identified as having come from that particular weapon, the ballistics expert was able to definitively exclude the Ruger

pistol as the weapon that fired one of those two bullets.[9]  *See supra* at 8–9 & n.6.  Further, in her phone call to the police shortly after the shooting, Tiffnie stated that Charboneau had shot her mother.  *Charboneau*, 395 P.3d at 381.

Finally, we note that the other materials found in the envelope containing the Tira Letter provide, if anything, additional corroboration of Charboneau's consciousness of guilt.  The state trial court found, and the Idaho Supreme Court agreed, that the "Balzer Statement" was a forgery.  *See Charboneau*, 395 P.3d at 388.  The trial court found that Shedd, a library specialist at the state prison, forged the letter; that he had assistance from another person in doing so; but that "no evidence points to Charboneau, or anyone sympathetic to him, as the culprit."  The Idaho Supreme Court rejected this latter finding, instead holding that "the only person" who could have helped Shedd forge the statement "was Charboneau."  395 P.3d at 388.  The state trial court also held that Charboneau had failed to establish that the "Shedd Emails" were genuine.  The court found that "the evidence points" to the "inference" that these emails "were prepared or doctored by someone with access" to the prison email system and computers, but that there was "no evidence" suggesting that they were "prepared by anyone friendly to Charboneau."  Once again, the Idaho Supreme Court rejected the last part of this finding, instead stating that

---

[9] The Idaho Supreme Court was therefore plainly incorrect in stating that the "forensic evidence showed that [Marilyn] was shot at least fourteen times with that rifle."  395 P.3d at 392.  The forensic evidence did show that Marilyn had been shot at least 14 times, but only seven bullet fragments were recovered from her body, and only five of those seven were definitively tied to Charboneau's rifle.  *See supra* at 8–9 & n.6.  Counsel for the State acknowledged at oral argument in this court that the Idaho Supreme Court's opinion was wrong in stating that 14 shots had been tied to the Remington rifle.

"Shedd had access to the e-mail system, and he forged the Balzer Statement to *benefit* Charboneau." 395 P.3d at 389 (emphasis added). For the reasons we explained earlier, a presumption of correctness attaches to the resulting specific findings of the state courts that (1) Charboneau assisted Shedd in preparing a forged document in support of Charboneau's claim that the Tira Letter was suppressed; and (2) Shedd could have doctored the "Shedd Emails" to benefit Charboneau. Moreover, in light of Charboneau's involvement in the former forgery by Shedd, a reasonable trier could infer that Charboneau was also involved in Shedd's latter doctoring of evidence. And in deciding how much probative weight to give to the Tira Letter in light of all of the other evidence, a reasonable factfinder could readily conclude that Charboneau's participation with Shedd in the creation of false evidence is an additional fact that suggests a consciousness of guilt on Charboneau's part. *See State v. Ehrlick*, 354 P.3d 462, 479 (Idaho 2015) ("Evidence which tends to show that the accused has attempted to fabricate or procure false evidence is admissible as showing a consciousness of guilt." (simplified)).

Taking all of this evidence together, we conclude that Charboneau has failed to show that the statements recounted in the Tira Letter "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty" of first-degree murder. 28 U.S.C. § 2244(b)(2)(ii). Given the uncontested evidence that Charboneau shot Marilyn multiple times; his statements admitting possession of the rifle at the relevant times; the forensic evidence tying at least five shots to that rifle; and the substantial conflicts between the Tira Letter and the testimony of Tira herself, her husband, and Charboneau, we hold that the Tira Letter's

statements lack sufficient probative force and reliability to establish—much less clearly and convincingly—that no reasonable factfinder would have convicted Charboneau. Accordingly, Charboneau failed to meet the threshold requirement of § 2244(b)(2)(B)(ii).   The district court therefore properly dismissed his petition without reaching the merits of his *Brady* claim.

**AFFIRMED.**